UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COTY L. McCAULEY,

        Petitioner,

    v.

CARMEN PALMER,

        Respondent.[1]

_____/

CASE NO. 2:14-CV-11198
JUDGE ARTHUR J. TARNOW
MAGISTRATE JUDGE PAUL J. KOMIVES

## **REPORT AND RECOMMENDATION**

*Table of Contents*

I.    RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.   REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    D.    *Tainted Jury (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    E.    *Penalty Evidence (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    F.    *Ineffective Assistance of Counsel (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    G.    *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    H.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
III.  NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*      *      *      *      *

I.    RECOMMENDATION: The Court should deny petitioner's application for the writ of

habeas corpus and should deny petitioner a certificate of appealability.

II.   REPORT:

_____

[1]By Order entered this date, Carmen Palmer has been substituted in place of Steven Rivard as the proper respondent in this action.

A.    *Procedural History*

1.     Petitioner Coty Lee McCauley is a state prisoner, currently confined at the Michigan Reformatory in Ionia, Michigan.

2.     On October 5, 2010, petitioner was convicted in jointly tried cases of six counts of assault with a dangerous weapon, MICH. COMP. LAWS § 750.82; four counts of unlawful imprisonment, MICH. COMP. LAWS § 750.349b; and eight counts of possessing a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Livingston County Circuit Court.  On December 2, 2010, he was sentenced as a second habitual offender, MICH. COMP. LAWS § 769.12, to concurrent terms of 4-6 years' imprisonment on four of the assault convictions, 2-6 years' imprisonment on the other assault conviction, and 121 months' to 22½ years' imprisonment on each of the unlawful imprisonment convictions, all to be served consecutive to a mandatory term of two years' imprisonment on each felony-firearm conviction (concurrent with each other).

3.     Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.     DEFENDANT DID NOT RECEIVE A FAIR TRIAL, AND IT WAS AN ABUSE OF DISCRETION NOT TO GRANT A MISTRIAL GIVEN THE FACT THAT THE JURY WAS TAINTED.

II.     DEFENDANT WAS DEPRIVED OF A FAIR TRIAL WHEN THE PROSECUTOR IMPROPERLY INTRODUCED INFORMATION ABOUT POSSIBLE PENALTY TO THE JURY.

III.     THE MULTIPLE INSTANCES OF HEARSAY DEPRIVED DEFENDANT OF A FAIR TRIAL AND DEFENSE COUNSEL'S FAILURE TO OBJECT TO SOME OF IT RESULTED IN DEFENDANT RECEIVING INEFFECTIVE ASSISTANCE OF COUNSEL.

Petitioner also filed a supplemental *pro per* brief, addressing the claims raised by counsel.  The court

2

of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. McCauley*, No. 302027, 2012 WL 1560354 (Mich. Ct. App. May 3, 2012) (per curiam).

4.     Petitioner sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. McCauley*, 493 Mich. 919, 823 N.W.2d 581 (2012).

5.     Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on March 3, 2014.[2]  As grounds for the writ of habeas corpus, he raises the three claims that he raised in the state courts.

6.     Respondent filed an answer on June 12, 2014.  Respondent contends that petitioner's second and third claims are barred by petitioner's procedural default, and that all of petitioner's claims are without merit.

B.     *Factual Background Underlying Petitioner's Conviction*

The charges against petitioner arose from two separate incidents, one in Howell and one in Brighton, during the late evening of January 13, 2010.  The evidence adduced at trial was accurately summarized in the parties' briefs in the Michigan Court of Appeals.  As summarized in the prosecutor's brief:

> On January 13, 2010, Kenneth Goble was at the trailer he shared with Andrew Auxier.  That evening, while Kashmere Bice was already there with Ken, Defendant showed up with Brooke MacDonald.  Defendant and Kashmere were romantically involved at the time.  While Defendant and Kashmere were in a back bedroom, Ken walked back there to watch television and saw Defendant and Kashmere crouched in the corner of the bedroom having a serious conversation. When Ken walked in, Defendant "freak[ed] out," jumped up and angrily yelled at him to get out.  Ken left the room, sat down, and about 15 to 20 seconds later,

---

[2]Petitioner filed his application in the Western District of Michigan.  The case was transferred to this Court on March 21, 2014.

Defendant came down the hall, screaming and yelling. Using his fists, Defendant struck Ken repeatedly in the head and body. Ken reacted by curling up in a ball to protect himself. The beating ended only when Kashmere came out and literally sat on Ken's face to stop Defendant from beating him. Seeing that his face was swelling up, Ken went and locked himself in the bathroom.

While this was going on, Brandon Decare, who was at his nearby home, overheard a phone conversation that raised some concern, so he went to see Kashmere to see what was going on. When he arrived at the trailer, Brandon let himself in and saw Brooke MacDonald sitting at a computer in the living room. After he told Brook that he was there to pick up Kashmere, Brooke went to get her and Brandon heard Defendant yelling at Kashmere. Brooke returned to the computer and said that she was afraid for her life. Brandon then walked down the hallway to the bedroom and, as he did, he saw Ken Goble stick his head out of the bathroom and was amazed by the look of Ken's face. Brandon described that "[h]is eye was swelled like somebody hit him with a softball." Ken went back into the bathroom and Brandon proceeded into the bedroom. He saw Kashmere crouched in the corner with Defendant crouched next to her. Sitting on a nightstand, Brandon saw a black-handled kitchen steak knife. As Defendant sprung up, he grabbed the knife, came towards Brandon, and yelled at him that "he wasn't a person that I wanted to fuck around with [and] that this wasn't the place that I wanted to fucking be." While locked in the bathroom, Ken could hear Defendant screaming at Brandon and Brandon trying to calm him down. Brandon backed out down the hallway and as he did so, Defendant came towards Brandon, poked himself in the chest with the knife, and pointed the knife at Brandon within inches of Brandon's chest. Finally, Defendant lunged at Brandon one more time and Brandon fell backwards and yelled at Defendant to get off him. Defendant got up and returned down the hallway to the back room. Brandon told Brooke, who was still seated at the computer, that he was leaving and calling the police. Although Defendant was a friend of his, Brandon said he called [the] police because he was afraid that Defendant would hurt someone else. After Brandon left, Ken heard Brooke tell Defendant that Brandon was leaving to call [the] police. Defendant and Kashmere then left the trailer.

Andrew Auxier, who lived in the trailer with Ken, testified that after the police left his Howell trailer, he and Brooke, along with Seth Brunner, went to Defendant's house in Brighton. Seth Brunner testified that when they got to Defendant's, Defendant told them to come in the house. Once in the house, Defendant closed the door and angrily told them to "have a fucking seat on the couch." Seth, Brooke, Andrew, and Kashmere complied and all sat on the couch while Defendant yelled at them about how he wasn't "going back to the joint." Seth said they were on the couch for a few hours and Defendant told them they weren't leaving. Defendant told everyone to empty out their pockets and give him their cell phones. Seth and Defendant exchanged words and, although Seth said he didn't see a "supposed gun," when he thought to be a .22 caliber, he felt an object pressed to his neck and he was thinking whether or not Defendant was going to pull the trigger. Referring to the Howell incident, Defendant yelled about how unfair it was that Seth

4

got to see his son and that it wasn't fair that he wouldn't see his daughter born. Seth described Kashmere as crying and being "mouthy" while Brooke was "hysterical." At one point, Defendant told them that "if the cops come [they] were all leaving in a body bag." Although Seth said he never saw a gun, he did see Defendant strike both Brooke and Kashmere. Specifically, he saw Defendant pull Kashmere by the hair a few times and put his hands over Brooke's face and push her. Seth described the whole incident as lasting about three to four hours.

According to Seth, the ordeal ended when Defendant got emotional and started crying. He then let everyone go. Seth gave money to Brooke and Andrew to get food from Taco Bell, while he stayed with Kashmere and Defendant. At one point later, Kashmere's cell phone, which was lying on the floor, rang. Defendant grabbed the phone from her and hung it up, demanding to know "who the fuck is you talking to." After Seth received a text message, Kashmere's phone rang yet again and Defendant reacted by throwing her cell phone downstairs and then picking her up with both hands and putting her back on the couch. Kashmere then started crying again. Seth then left later once Brooke came back to pick him up.

After watching a tape of his prior statement to police, Seth testified that he saw Defendant grab Brooke and hold a piece of glass to her throat. He also said that when he got to Defendant's he saw Kashmere lying on the couch crying and that he heard Kashmere say that Defendant had put a gun in her mouth before he arrived at Defendant's. Seth also finally admitted that [he] saw a black, metal .22 caliber gun with a brown handle in Defendant's hand.

According to Andrew, however, when the three of them got to Defendant's, they saw Defendant there with Kashmere and just hung out and watched television for a few hours. Andrew claimed that he and Brooke left the trailer around two or three in the morning and that nothing happened. Andrew testified that he never saw a gun and that Brooke, Kashmere, and Seth were "fine."

Kashmere testified that she had been romantically involved with Defendant and that he was the father of her unborn baby. On the night of January 13, 2010, she testified that she went to Ken and Andrew's trailer to hang out and party. Ken, Brooke, and Defendant were already there and the four of them hung out together, drank, and talked. Eventually, Defendant and Kashmere went together to the back bedroom to talk about an argument they had had about Defendant seeing another girl. Ken walked into the bedroom and Defendant told him to leave. She said Ken got upset about it, threw a bag of potato chips at Defendant and walked out of the bedroom. Kashmere testified that Defendant followed him out a few minutes later and she saw Defendant hit Ken in the face with his fists. To get Defendant to stop, she sat on Ken's face. Defendant stopped hitting Ken and, with Ken's face being all bloody, they apologized to each other. Kashmere and Defendant then went back into the bedroom when Brandon walked in and Defendant angrily told him to leave. But because Brandon wouldn't leave without Kashmere, she said Defendant got up and followed Brandon out of the bedroom. When she came out of the bedroom, she said Brandon was gone and that she heard Ken say that Brandon was going to call police. Once they heard that the police were coming, according to Kashmere, she, Brooke,

and Defendant decided to leave.  Kashmere claimed she didn't see or hear anything about a knife or about Brandon being threatened with one.

Kashmere said that she and Defendant went to his house in Brighton.  Later on, Brooke, Andy, and Seth showed up and, according to Kashmere, everyone was calm and sitting on the couch together.  Although Defendant was angry and yelling bout getting [in] trouble for what happened with Brandon and Ken, Kashmere testified that she never saw a gun.  According to Kashmere, eventually everyone left and she stayed and spent the night with Defendant.

Starting with the incident in Howell, Brooke MacDonald testified that she saw Defendant and Kashmere go into the back bedroom.  After a little while, she saw Ken go back to the room as well.  A few seconds later, she saw Defendant come out after Ken yelling at him.  Brooke saw Defendant beat up Ken while Ken curled into a ball and started to cry.  Brooke said she saw Kashmere come out and tell Defendant to stop hitting Ken and that Defendant and Kashmere then went back into the bedroom.

Brooke testified that a little while later, Brandon came over and asked where Kashmere was.  She told Brandon that they were in the back bedroom and Brandon walked to the room.  Moments later Brandon came backwards out of the room followed by a screaming Defendant.  When they got to the end of the hallway, she saw Defendant grab a knife off a counter, push Brandon over and hold the knife to his throat.  Defendant then poke himself in the chest with the knife.  Brooke described that Defendant was "in a rampage."

Brooke said that Defendant then walked back to the bedroom.  Brandon then left, saying he was going to call police.  Afterwards, Brooke went back to the bedroom to see what was going on and saw that Kashmere was sitting in the corner crying.  With Defendant yelling and Kashmere crying, Defendant asked Brooke to take the three of them to Brighton where she dropped off Defendant and Kashmere.

Eventually, Brooke went back to Defendant's house with Seth and Andrew after she received a text from Kashmere asking her to come and pick her up.  When they got there, Brooke called and texted Kashmere without a response.  Finally, she knocked on the front door.  Defendant answered the door and was very angry.  She told Defendant she was there to pick up Kashmere and asked where she was.  Defendnat yelled at her repeatedly that she had to call the police.  As Defendant continued to yell at her, Defendant asked who else was with her.  She told Defendant that Seth and Andrew were.  After she came inside alone, Defendant threw a large glass vase to the ground and broke it.  He took a piece of the broken glass, held it to the side of her throat, and walked her outside.  He pushed her down the step and yelled at Andrew and Seth that "they better come in the house or he was gonna kill [Brooke]."  Once everyone got in the house, Defendant locked the door and instructed them to sit on the couch and not to move or he'd kill them.  Kashmere came in the room, clearly having been crying, and sat down on the couch next to Brooke.  Defendant then told everyone not to move and he started walking downstairs.  Brooke heard Kashmere say that Defendant was going to get the gun and that it was underneath the snow outside the window.  Defendant returned,

holding a gun in his hand.  He then held it to Brooke's head, yelling that he was going to get in trouble for what happened in Howell.  He also asked "why should you guys get to live your life if I can't live mine."  At some point, Defendant also took Brooke's keys and all the cell phones.  Defendant took the gun and held it to Andy's head, Seth's neck, and Kashmere's head, and did this to each of them more than once.  Defendant was yelling all the time, including saying "why should you guys see your kids if I can't see mine" and that if the police came, they'd all be leaving in body bags.  Kashmere cried as this was going on.  Brooke estimated that this lasted for probably three hours until Defendant finally sat down in a chair, took a clip out of the gun, threw the clip to the ground, put the gun in his lap, then said that they could leave, and started crying.  Brooke grabbed her phone and keys and told Defendant "it was okay" and left.

While Defendant was in jail awaiting trial, he discussed with Kashmere the charges that he faced and the witnesses that would be required to testify to prove those charges.  He also wrote a number of letters to Kashmere, which were admitted at trial.  In those letters, as read by one of the officers, Defendant wrote:

"Oh, yeah, I need you to talk to Ken for me.  You and him could be witness for – you and him could be witnesses for the Brandon charge.  If both say I never had a knife, then that's one charge down, five to go."

. . .

"I really hope they drop the charges for you, and Andy, and Seth.  Well, the gun charge more than anything.  I wish Andy would at least call my lawyer and to tell him that nothin' happened.  I really wish he would come test – I really wish he would come testify like you're gonna.

. . .

"Is gonna depend on the testimony of all the witnesses, but if Seth don't talk, and you and Andy are saying it's Brooke – that Brooke's lyin', I wonder if Andy and Seth don't show up if they will drop the charges."

. . .

"That's what Brooke and Seth are gonna have to show – to show up and go on the stand against me.  They're gonna try to scare both them will charge – all them with charges.  They can't charge you because you never said or wrote that it happened.  You know there's gonna – they're gonna go hard on you, Kash; don't let them break you.  And Andy needs to help me."

. . .

"So, anything you can do will help.  Andy needs to say nothin' happened to the paper.  All he has to say is Brooke picked him and Seth up, they came over and chilled for awhile, then Brooke took him back home."

Pl.-Appellee's Br. on Appeal, in *People v. McCauley*, No. 302027 (Mich. Ct. App.), at 1-12

(footnotes and citations to trial transcript omitted); *see also*, Def.-Appellant's Br. on Appeal, in *id.*,

at 2-12.

C.     *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim--
>      (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
>      (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a

result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam)

(quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535

8

U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409. As the Supreme Court has explained, the standard for relief under § 2254(d) "is difficult to meet, [and] that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). As the Court explained, "[s]ection 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)). Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court

decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).  The relevant "clearly established law" is the law that existed at the time of the last state court decision to issue a reasoned decision on the claim, *see Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011), and in evaluating the reasonableness of that decision a federal habeas court is limited to the record that was before the state court at the time of its decision, *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.     *Tainted Jury (Claim I)*

Petitioner first contends that he was denied a fair trial because the jury was biased based on one juror's fear of serving on the jury.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

10

1.    *Clearly Established Law*

"The Sixth and Fourteenth Amendments to the Constitution guarantee a criminal defendant the right to an impartial jury." *Wolfe v. Brigano*, 232 F.3d 499, 501 (6th Cir.2000) (citing *Morgan v. Illinois*, 504 U.S. 719 (1992)). The Sixth Amendment jury trial right "implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965). However,

> due process does not require a new trial every time a juror has been placed in a potentially compromising situation. . . . Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Smith v. Phillips*, 455 U.S. 209, 217 (1982). In *Remmer v. United States*, 347 U.S. 227 (1954), the Court held:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Remmer*, 347 U.S. at 229. Although *Remmer* spoke of a "presumption of prejudice," the Court has subsequently indicated that a defendant alleging improper juror contact must demonstrate actual prejudice. In *Smith*, the Court cited *Remmer* in stating that "[t]his Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove bias." *Smith*, 455 U.S. at 215. As the Court explained:

> [D]ue process does not require a new trial every time a juror has been placed in a

11

> potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. . . .  [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Smith*, 455 U.S. at 217.   In light of *Smith*, the presumed prejudice language of *Remmer* is no longer good law; all that is required is a hearing at which the defendant is given the opportunity to establish that the improper contact caused actual prejudice.  *See United States v. Pennell*, 737 F.2d 521, 532-33 (6th Cir. 1984); *see also*, *United States v. Olano*, 507 U.S. 725, 739 (1993) (whether viewed as a presumed prejudice test or a case-by-case determination, question in all cases is "did the intrusion affect the jury's deliberations and thereby its verdict."); *United States v. Corrado*, 304 F.3d 593, 603 (6th Cir. 2002).  A claim that a juror was subject to extraneous influence is subject to harmless error analysis.  *See Pyles v. Johnson*, 136 F.3d 986, 992 (5th Cir. 1998); *Sherman v. Smith*, 89 F.3d 1134, 1138-40 (4th Cir. 1996).  Thus, even if an extraneous influence occurred, petitioner is entitled to habeas relief only if the error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also*, *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (explaining that *Brecht* harmless error standard applies on habeas review regardless of whether or under what standard the state court conducted harmless error review).  "[I]in a habeas corpus proceeding, a state court's findings on whether, and how, extraneous matters affected jury deliberations 'deserve[ ] a "high measure of deference."'"  *Mahoney v. Vondergritt*, 938 F.2d 1490, 1492 (1st Cir. 1991) (quoting *Rushen v. Spain*, 464 U.S. 114, 120 (1983) (in turn quoting *Sumner v. Mata*, 455 U.S. 591, 598 (1982))).

    2.    *Analysis*

12

Petitioner's claims arise from concerns expressed by one of the jurors after *voir dire*. As explained by the Michigan Court of Appeals:

> After voir dire was completed and the selected jurors were sent home, the trial court received a telephone call from the husband of Juror 66, who expressed concern that Juror 66 had disclosed his name and place of work. The trial court questioned Juror 66 the following morning. Juror 66 admitted that she told "a few" jurors that she regretted telling the trial court where her husband worked and that she had safety concerns. After dismissing Juror 66, the trial court individually questioned the remaining jurors.
>
> Juror 70 stated that in a conversation among three or four jurors, including herself and Juror 51, Juror 66 stated that she regretted informing the trial court where her husband worked and that she was concerned for her safety. Juror 70 stated that Juror 66's concerns about safety did not cause her any concern about serving on the jury. She believed that she could be fair and impartial. Juror 51 stated that he had no conversations with Juror 66 or Juror 70 about defendant's case. He did not recall a juror discussing her husband, nor did he recall a juror being fearful. Juror 66 did not even sit near him in the jury room. The remaining jurors denied having any conversations with Juror 66 about defendant's case.

*McCauley*, 2012 WL 1560354, at *1; *see also*, Trial Tr., Vol. II, at 3-69. The Michigan Court of Appeals rejected petitioner's claim, concluding that the trial court did not abuse its discretion in failing to grant a mistrial. The court reasoned that because "only Juror 70 recalled having a conversation with Juror 66, and she believed she could be fair and impartial, there is nothing to suggest that any juror could not base his or her decision on the evidence produced at trial." *McCauley*, 2012 WL 1560354, at *2. The Court should conclude that this determination was reasonable.

As required by *Remmer* and *Smith*, the trial court held a hearing at which it questioned each juror regarding his or her knowledge of the fears expressed by Juror 66. The court also permitted counsel for each defendant to question each juror. This was sufficient under the circumstances of the case to satisfy *Remmer*'s hearing requirement. *See Corrado*, 304 F.3d at 604-05. And, as noted above, the trial court's conclusion that the jurors remained impartial is presumed correct unless

13

rebutted by clear and convincing evidence.  Here, petitioner has offered no clear and convincing evidence that the remaining jurors were not impartial.  The state courts found that only Juror 70 was exposed to Juror 66's comments, and petitioner has pointed to no evidence to rebut this finding.  *See* 28 U.S.C. § 2254(e)(1).  And with respect to Juror 70, she unequivocally stated that she could be fair and impartial notwithstanding Juror 66's comments.  *Smith* instructs that courts are not to regard jurors' assessments of their impartiality as "inherently suspect."  *Smith*, 455 U.S. at 217 n.7; *see also, id.* ("[O]ne who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he had an unbiased mind in a certain matter.").  Thus, the trial court was permitted to "rely upon [the jurors'] assurances in deciding whether [petitioner] . . . satisfied the burden of proving actual prejudice."  *Pennell*, 737 F.2d at 533.  In short, "[p]etitioner was not denied a fair trial because of [Juror 66's fears] . . . , because . . . Juror [66] was excused from jury service, and the remaining jurors did not express any fear or uneasiness about this contact."  *Parker v. Renico*, 450 F. Supp. 2d 727, 736 (E.D. Mich. 2006) (Cohn, J.), *aff'd*, 506 F.3d 444 (6th Cir. 2007).  The trial court conducted a hearing in accordance with *Remmer*, and petitioner has not provided any evidence to show that the remaining jurors were anything other than impartial.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.      *Penalty Evidence (Claim II)*

Petitioner next contends that he was deprived of a fair trial by the introduction of evidence of the possible penalty he faced if convicted.  Petitioner presents this claim as both an evidentiary claim and as a prosecutorial misconduct claim.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

14

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987).  "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law.  State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993).  As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).  In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001).  Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its

shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In reviewing whether a prosecutor has deprived a defendant of a fair trial, a court may not consider the prosecutor's conduct in isolation, but must judge the conduct in the context of the entire proceedings. *See Brown v. Payton*, 544 U.S. 133, 144 (2005); *United States v. Young*, 470 U.S. 1, 11 (1985); *Donnelly v. DeChristoforo*, 416 U.S. 636, 645 (1974). Even where, as here, AEDPA deference does not apply, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." *Young*, 470 U.S. at 11.

2.      *Analysis*

Petitioner contends that he was denied a fair trial by the introduction of evidence regarding the possible penalty he faced if convicted, and that the prosecutor committed misconduct by introducing such evidence. At trial, Bice's testimony generally, though not completely, favored the defense.[3] With respect to the incident in Howell, Bice corroborated the testimony of Goble and Decare about petitioner assaulting Goble, except that she never saw petitioner with a knife. *See* Trial Tr., Vol. III, at 22-27, 36. With respect to the Brighton incident, however, Bice testified that

---

[3]At the time of trial, Bice and petitioner remained in a relationship, and Bice was pregnant with petitioner's child.

16

nothing happened at petitioner's house later that night. She denied that petitioner had pulled her hair or hit her or that he had asked her or anyone else to lie for him, denied seeing petitioner with a gun, and testified that she did not feel that she was unable to leave petitioner's home. *See id.* at 46-55, 60-63, 102-03. On redirect examination, Bice admitted that petitioner had sent her letters while he was awaiting trial, in which he discussed the charges against him and the witnesses. *See id.* at 117.[4] The following exchange occurred between Bice and the prosecutor, with an intervening objection by defense counsel:

> Q    Ms. Nalley [defense counsel] asked you – she asked you you're willing to say that Coty did something wrong with Ken, right?
>
> A    Correct.
>
> Q    And you said that. What do you think is a more serious crime, punching somebody in the face or threatening them with a weapon?
>
> A    Threatening them with a weapon.
>
> Q    And of course in the letters that you have admitted to receiving, Coty talks about which crimes are more serious and which ones aren't, right?
>
> A    I guess so.
>
>        \* \* \* \*
>
> MS. NALLEY:    We're getting awful close at talking about punishment and penalty.
>
> MS. DEL VERO:    I haven't asked her that yet.
>
> MS. NALLEY:    Well we're talking about harsher and this is what's harsher and Coty talked about what's more harsher.
>
> MS. DEL VERO:    I guess if she want to object if she thinks I've done something wrong, but I'm not there, I'm not gonna get there. But her

---

[4]The letters were later admitted through the testimony of Officer Michael Arntz, who received copies of the letters because one of the conditions of his bond was that he have no contact with any of the victims. *See* Trial Tr., Vol. IV, at 11-15, 120-30.

feeling about what's more serious and what's not goes to her motivation for being willing to admit about Ken and not about anything else.  It clearly shows.

THE COURT:         You're getting into bias?

MS. DEL VERO:      Yeah.

MS. NALLEY:        But I believe it may be a bias but I also believe that its prejudicial.  More substantially prejudicial than probative to the jury because again, punishment is something we –

MS. DEL VERO:      I'm not even suggesting that she's right.

MS. NALLEY:        – never even suggested.

THE COURT:         Okay.

MS. DEL VERO:      I'm not even suggesting that she's right.

*Id*. at 120-21.  After the court permitted the prosecutor to continue this line of questioning, the

following exchange occurred:

Q         Coty did discuss with you the seriousness of some charges versus others, right?

A         He discussed the charges he was going to get.

Q         He didn't discuss with you how some were more serious than others?

A         I don't remember.  If you could please read me what you're looking at.

*Id*. at 122.  After a further objection by defense counsel, the prosecutor rephrased the question:

Q         I'll ask it this way because I'm not sure that I can find a real specific statement right at this very moment.  Suffice to say in your mind punching Ken in the face is less serious than other allegations that have been made against Coty, correct?

A         Is less serious?

Q         Yes.

18

A       Ken, yes.

*Id*. at 122-23.

The Michigan Court of Appeals rejected petitioner's claims relating to this testimony. Although noting that "[a] prosecutor may not comment on a defendant's possible punishment," *McCauley*, 2012 WL 1560354, at *2, the court found that the prosecutor had not committed misconduct because the questions were a good faith effort to admit evidence. Moreover, the court reasoned, "when the prosecutor elicited testimony from Bice that she believed that defendant's act of punching Goble was not as serious as the charges defendant was facing, the prosecutor did not confirm that Bice's belief was correct. The prosecutor also did not inform the jury of the prison terms defendant, if convicted, would receive. Under these circumstances, the prosecutor neither commented on nor elicited testimony about defendant's possible punishment." *Id*. The court of appeals also rejected petitioner's evidentiary claim that the testimony was irrelevant and unduly prejudicial. The court explained that "[w]hether a witness is testifying truthfully and accurately is itself relevant," and that "Bice's belief threw light on a possible motivation for Bice to admit that defendant punched Goble but to deny that anything happened in defendant's duplex." *Id*. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

With respect to petitioner's evidentiary claim, petitioner cannot show that Bice's testimony was so unreliable that its admission deprived him of a fair trial. As an initial matter, petitioner can point to no clearly established federal law, as determined by the Supreme Court, which prohibits informing the jury of the possible consequences of a conviction as a matter of federal constitutional law. In any event, even as a matter of simple evidence law petitioner's claim fails. As a matter of both state and federal evidence law, of course, it is generally not permissible for the court or the

19

prosecutor to inform the jury of the possible punishment a defendant faces if convicted.  *See United States v. Bender*, 265 F.3d 464, 472 (6th Cir. 2001) (citing *Shannon v. United States*, 512 U.S. 573, 579 (1994)); *People v. Petri*, 279 Mich. App. 407, 414, 760 N.W.2d 882, 887 (2008); *People v. Torres*, 222 Mich. App. 411, 423, 564 N.W.2d 149, 155 (1997).  Neither the prosecutor's questions to Bice nor Bice's answers, however, ran afoul of this prohibition.  The prosecutor did not ask Bice to state what the potential penalties were, nor did the prosecutor inform the jury of the potential penalties.  Indeed, as the prosecutor noted, the prosecutor did not even confirm Bice's beliefs as to which were the more serious crimes.  Rather, the prosecutor merely sought to explore what Bice herself thought were the more serious charges in an effort to show why Bice, who generally testified favorably to petitioner, might admit that petitioner committed some crimes but not others.  This was a permissible means of exploring Bice's motivations for testifying as she did, and did not provide the jury any information regarding the potential sentences petitioner faced if convicted of any of the charges.  And because the evidence was properly admitted, petitioner likewise cannot show that the prosecutor committed misconduct, as a prosecutor does not commit misconduct by introducing admissible evidence or commenting on evidence admitted in the course of the trial during argument.  *See Sweet v. Delo*, 125 F.3d 1144, 1154 (8th Cir. 1997); *Hammond v. Michigan Parole Bd.*, No. 04-73385, 2006 WL 2161028, at *16 (E.D. Mich. July 31, 2006) (Roberts, J., adopting Recommendation of Komives, M.J.).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Ineffective Assistance of Counsel (Claim III)*

Finally, petitioner contends that his trial counsel was constitutionally ineffective in failing to object to multiple instances of hearsay.  The Court should conclude that petitioner is not entitled

to habeas relief on this claims.

1.     *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818,

833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

2.    *Analysis*

Petitioner contends that she counsel was ineffective for failing to object to the following

22

hearsay: (1) MacDonald's testimony that her doctor told her she was suffering from post-traumatic stress disorder (PTSD); (2) MacDonald's testimony that, while in petitioner's home, Bice told her that petitioner was going to get a gun; (3) MacDonald's testimony that, when they were driving away from petitioner's home, Auxier told her not to tell anyone what had happened; (4) MacDonald's testimony about telephone calls from Theresa Grace (petitioner's girlfriend), Cassie, and Bice.  With respect to each of these portions of testimony except for the first, the Michigan Court of Appeals concluded that no hearsay testimony was improperly admitted.  With respect to (2), the court concluded that Bice's statement was admissible as an excited utterance under MICH. R. EVID. 803(2).  *See McCauley*, 2012 WL 1560354, at *3.  With respect to (3), the court concluded that Auxier's statement was not hearsay because "[c]ommands, which are incapable of being true or false, are not hearsay."  *Id*.  With respect to the phone calls from Theresa Grace, the court of appeals noted that "MacDonald testified that she had heard Grace wanted to speak with her," but that she "never actually testified about any statement that Grace made to her."  Thus, "no out-of-court statements by Grace were improperly admitted."  *Id*. at *4.  With respect to the phone call from Cassie, the court explained that MacDonald testified only that Cassie had "asked her whether she had talked to the police.  Questions, like commands, are incapable of being true or false.  Therefore, Cassie's question to MacDonald was not hearsay."  *Id*.  Finally, with respect the conversations with Bice, the court of appeals explained that Bice's statement to MacDonald that she wanted to leave Howell was not offered "for the truth of the matter asserted but, rather, to show its effect on MacDonald's state of mind."  *Id*.  Because "[o]ut-of-court statements that are not offered for the truth of their contents are not hearsay," there was no error in the admission of this testimony.  *Id*. MacDonald also testified "that Bice asked her if she was going to plead the Fifth Amendment at

trial." *Id*. As with the testimony concerning Cassie's statements, however, the court concluded that "because questions are incapable of being true or false, Bice's question to MacDonald was not hearsay." *Id*.

Thus, with the exception of MacDonald's testimony relating to the PTSD diagnosis, the Michigan Court of Appeals determined that the evidence was admissible as a matter of state law. In analyzing petitioner's ineffective assistance of counsel claims, these expressions of state law are binding on this Court. *See Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999). *See generally*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007) ("A determination of state law by a state appellate court is . . . binding in a federal habeas action."). "And because the evidence was admissible under state law, petitioner cannot show that any objection to the evidence . . . would have been successful. It follows, therefore, that petitioner cannot show that counsel was deficient, or that he was prejudiced by counsel's failure to object." *Lucas v. Rivard*, No. 2:10-CV-14948, 2012 WL 5990221, at *16 (May 11, 2012) (Komives, M.J) (citing *Keller v. Larkins*, 251 F.3d 408, 419 (3d Cir. 2001); *Bradley v. Birkett*, 192 Fed. Appx. 468, 475 (6th Cir. 2006); *Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993)), *magistrate judge's report adopted*, 2012 WL 5989857 (E.D. Mich. Nov. 30, 2012) (Hood, J.); *accord Hetzer v. Trombley*, No. 04-74971, 2006 WL 587487, at *6 (E.D. Mich. Mar. 10, 2006) (Tarnow, J., adopting Report of Komives, M.J.).

With respect to MacDonald's testimony regarding her doctor's diagnosis of PTSD, the Michigan Court of Appeals agreed "that the doctor's out-of-court statement was inadmissible hearsay." *McCauley*, 2012 WL 1560354, at *3. However, the court of appeals concluded that petitioner was not prejudiced by this testimony, reasoning:

> The prosecutor did not question MacDonald about PTSD, including its causes, nor did the prosecutor argue that MacDonald's testimony was credible because MacDonald had been diagnosed with PTSD. Further, much evidence was presented that Bice and Auxier were not credible witnesses. For example, Bice denied that she and defendant had ever discussed the case, aside from when defendant asked her to get Auxier to talk to defense counsel, until she was shown the postcards that defendant had written her from jail. In the postcards, defendant asked Bice to talk with Goble and summarized the testimony that he needed from Bice and Auxier. Given the evidence of defendant's guilt and the credibility problems that plagued Bice and Auxier, we cannot conclude that MacDonald's brief and unemphasized testimony that her doctor said she had PTSD affected the outcome of defendant's trial.

*Id*. This determination was reasonable. As the court of appeals noted, MacDonald briefly mentioned that her doctor had diagnosed her with PTSD. After that brief mention, nobody again brought up the subject. The case was essentially a credibility contest between Brunner and MacDonald, on the one hand, and Bice and Auxier, on the other, as to what happened at petitioner's home in Brighton. The PTSD diagnosis had no bearing on this credibility contest that was obvious to the jury, and neither the prosecutor nor defense counsel argued that the diagnosis made MacDonald more or less credible. In light of the extensive evidence presented at trial, including the significant testimony that went to exploring each witness's credibility, MacDonald's statement that she had been diagnosed with PTSD had no effect on the jury's verdict. Thus, there is not a reasonable probability that the result of the proceeding would have been different had counsel objected to this testimony, and the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.   *Recommendation Regarding Certificate of Appealability*

1.   *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge

issues a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.  Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a

certificate of appealability "state the specific issue or issues that satisfy the showing required by §

2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of

Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not

issue."  FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory

committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either

grant or deny the certificate of appealability at the time of its final adverse order, I include a

recommendation regarding the certificate of appealability issue here.

      2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the

Court should also conclude that petitioner is not entitled to a certificate of appealability.  In light of

the trial court's findings regarding the jury's exposure to the fears expressed by Juror 66 and the

deference this Court must give those findings, the resolution of petitioner's biased jury claim is not

reasonable debatable.  Because there is no clearly established federal law that prohibits a prosecutor

from introducing evidence about possible penalties, and because in any event the prosecutor did not

introduce any such evidence, the resolution of petitioner's second claim is not reasonably debatable.

Finally, because this Court is bound by the Michigan Court of Appeals's determination that the bulk

of the out-of-court statements were admissible as a matter of state law, and because it is clear that

petitioner can show no prejudice from the testimony that MacDonald was diagnosed with PTSD, the

resolution of petitioner's ineffective assistance claim is not reasonably debatable.  Accordingly, the

Court should deny petitioner a certificate of appealability.


H.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.  If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: September 9, 2014            s/Paul J. Komives
                                    PAUL J. KOMIVES
                                    UNITED STATES MAGISTRATE JUDGE

28